**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                       **Case 2:17-cr-20178-JTF**

**COURTNEY BLAND,**

        **Defendant.**

---

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS**

---

Before the Court is Defendant Courtney Bland's Motion to Suppress.  (Docket Entry "D.E." #19).  The instant motion was referred to the United States Magistrate Judge for Report and Recommendation.   A hearing on the instant motion was held on November 3, 2017.  For the reasons set forth herein, it is recommended that Defendant's Motion to Suppress be DENIED.

## I.    PROPOSED FINDINGS OF FACT

On October 19, 2016 at approximately 6:26 p.m., Officer Onrico Atkins, a detective with the Organized Crime Unit ("OCU") of the Memphis Police Department ("MPD"), was on patrol and initiated a traffic stop of a black Infiniti because the driver was observed not wearing a seat belt.  (Transcript of November 3, 2017 Suppression Hearing ("Tr.") at 7:13-23, 8:1-14, 8:21-25, 9:1-4, 24:9-25:25, 41:13).   In doing so, he activated the lights and siren on his unmarked white Dodge Durango.  (Tr. at 9:5-8, 23:20-24:8).  Detective Atkins, who was wearing a police vest and badge, approached the driver's side door and made contact with the driver.  (Tr. at 9:24-25,

1

36:1-5).  Only one individual---the driver, who was later identified as Defendant---was in the vehicle.  (Tr. at 10:1-18).

Detective Atkins informed Defendant why he had been pulled over and then observed that Defendant was "reluctant to make eye contact" and his "hands were shaking nervously." (Tr. at 10:21-25, 11:1-3).  Detective Atkins testified that, in his opinion, Defendant's behavior does happen but is not common.  (Tr. at 11:2-3, 11:7-8, 35:4-13, 37:12-38:18).  Further, when Detective Atkins asked Defendant about his driver's license, "his speech pattern was stuttered, and it was also shaky, nervous."  (Tr. at 11:13-15).  Detective Atkins wondered "why he was so nervous on a routine traffic stop like that."  (Tr. at 11:18-19).  Defendant did not provide his driver's license but did provide his social security number.  (Tr. at 11:22-25).  Detective Atkins then used his department-issued PDA to search his social security number, which provided that Defendant had a valid driver's license and no warrants.  (Tr. at 12:1-10, 34:15-20, 37:23-25, 46:9-23).

Detective Atkins then spoke to Defendant briefly[1] and, "[b]ecause of his behavior," asked one of his partners to come to the location so he could request that Defendant step out of the vehicle.  (Tr. at 12:11-21, 51:25-52).  Requiring an individual to step outside the vehicle when he or she demonstrates signs of excessive nervousness is Detective Atkins' general practice because he prefers to do additional investigating into the cause of his or her nervousness as well as insure officer safety.  (Tr. at 44:23-45:14).  Detective Atkins requested an additional officer be present due to Defendant's demeanor before he made the request for Defendant to step outside of the car.

---

[1]  On cross examination, Detective Atkins was presented with his testimony at the preliminary hearing, at which he specifically stated that, due to Defendant's nervousness, he asked Defendant whether he had "anything in the vehicle to be nervous about."  (Tr. at 31:19-21).  Detective Atkins does not mention asking Defendant this question at the evidentiary hearing on the Motion to Suppress.  (Tr. at 33:24-34:2).

(Tr. at 13:2-4).  Detective Andre Nash arrived at the scene within a "matter of seconds," at which time Detective Atkins demanded that Defendant exit his vehicle.  (Tr. at 13:8-14:1, 38:19-39:7, 41:2-4).  Detective Nash also observed that Defendant's behavior was "different" from the normal traffic stop in that he was not conversing but was only "looking down towards the steering wheel."  (Tr. at 52:12-53:5).

As Defendant began to exit his vehicle, Detective Nash walked from the passenger side to the driver's side to join Defendant Atkins.  (Tr. at 13:20-23, 53:8-54:15).  Detective Atkins and Detective Nash both observed a black handgun in the floor of the driver's seat.  (Tr. at 14:6-17, 15:16-22, 41:5-9, 42:4-7).  Detective Atkins observed from his vantage point that Defendant's right foot was on top of the gun, and Detective Nash observed from his point of view that it was on the floor.  (Tr. at 14:6-7, 54:19).  Detective Atkins recalls that it was still daylight and that, because Defendant had been acting nervously, he wanted to "secure" Defendant to prevent any incidents.  (Tr. at 14:15-25, 41:15-24).  Thus, Detective Atkins "grabbed" Defendant while Detective Nash stood back, and Defendant then spontaneously stated that he was "nervous because he was a convicted felon."  (Tr. at 14:21-15:15, 42:8-13, 54:23-55:4).

Defendant was subsequently placed in handcuffs in Detective Atkins' white Dodge Durango unmarked squad car.  (Tr. at 15:23-16:6).  Detective Atkins estimated that it took "a couple of minutes" from the time he pulled over Defendant until he was told to get out of his vehicle.  (Tr. at 39:3-21).  Detective Atkins states that it would "depend[]" on how long it would have taken to, in the alternative, write Defendant a misdemeanor citation for driving without a

seatbelt because he would have had to "run the VIN," verify the driver's license information, and "make sure the PDA is totally correct." (Tr. at 39:22-40:8).

Detective Atkins began working on the arrest ticket, and Detective Nash began working on the vehicle inventory. (Tr. at 20:24-21:2). The firearm was determined to be a Springfield .45 caliber pistol, and it was loaded with fourteen rounds. (Tr. at 14:8-14, 54:20-22). The firearm was further determined to be stolen. (Tr. at 16:19-24). Detective Atkins also ran the VIN on the vehicle as well as the tags on the vehicle; while the vehicle was registered to Defendant, the tags were from a Nissan Altima not registered to Defendant. (Tr. at 9:13-19, 17:1-7).[2] Detective Atkins further determined that, due to the location of Defendant's vehicle blocking the entrance to a private apartment complex, it would have to be towed. (Tr. at 16:8-9, 20:2-23). Detective Nash began the inventory for the towing, and he located a bag of white powder in the "sunglass visor" above the center console. (Tr. at 16:10-18, 21-12-19, 57:11-16). Detective Nash gave the bag of white powder to Detective Atkins, and Detective Atkins took it to his vehicle and asked Defendant what the substance was. (Tr. at 21:20-25, 57:17-19). Defendant advised that the white powder was heroin. (Tr. at 22:1-2). At the conclusion of the inventory, the Infiniti vehicle was towed. (Tr. at 22:6-10). Defendant's prior felony was confirmed, and Defendant was transported to the Criminal Apprehension Team ("CAT") office by Detective Aaron Putman. (Tr. at 22:17-24:12-13, 58:1-11, 102:20-23).

At the CAT office, Defendant elected to give statements, which Detective Putman took down and Detective Nash witnessed. (Tr. at 58:12-19, 59:6, 59:16-22, 62:17-63:6, 95:4-13).

---

[2]    Detective Atkins initially testified that he ran the tags on the vehicle before approaching Defendant's vehicle (Tr. at 9:11-19, 17:8-11); however, on cross examination, Detective Atkins was presented with his testimony at the preliminary hearing in this matter (Tr. at 28:17-29:1, 29:9-33:3). Thereafter, Detective Atkins testified that he had not conducted any investigation regarding the tags of the vehicle as late as when he instructed Defendant to exit his vehicle. (Tr. at 47:4-14).

Defendant was "calm" and advised that he wanted to do so "to try to work off his charges."  (Tr. at 59:9-11, 63:7-10, 95:14-16, 100:7-9).   Defendant was first put into an interview room.  (Tr. at 58:20-59:6, 95:17-25).   Detective Putman advised Defendant of his *Miranda* rights for the first time, which Defendant advised that he understood and did not ask for a lawyer, and provided a statement that Detective Nash witnessed.  (Tr. at 59:25-60:13, 96:1-11, 99:13-16).  There is no documentation of the first occasion that he was advised of these rights.  (Tr. at 75:23-76:8); however, Defendant subsequently gave his first statement of his personal information, which Detective Putman took down and Detective Nash witnessed.  (Tr. at 60:17-61:16, 97:10-98:15 & Exh. 2).  This personal information includes as follows: name; address; age, date of birth, sex, race, social security number, cell phone number, education, and, next of kin/emergency contact.

Next, Detective Putman advised Defendant of his *Miranda* rights for a second time, and Defendant initialed that he understood his rights.  (Tr. at 62:10-16, 63:11-65:20, 98:16-99:16 & Exh. 2).   After he was advised of his rights this second time, he gave a statement pertaining to the firearm.  (Tr. at 65:21-25 & Exh. 2).  Later, when questioning began once again, Defendant was advised of his *Miranda* rights for a third time, and a Rights-Waiver Form was completed.  (Tr. at 67:13-19 & Exh. 3).   At no time during the interviews did Detective Nash witness him invoke his rights.  (Tr. at 69:16-17, 96:1-11).  The interview process took some time because Defendant wanted to give information to earn "lesser charges," and it required time for law enforcement to validate the credibility of the information he provided.  (Tr. at 91:19-92:6, 99:17-100:6, 100:19-101:1).

During the interview process, Detective Nash and Detective Putnam both testified that they were not sure if anyone inquired if Defendant was intoxicated but that they did not observe

any signs of intoxication.  (Tr. at 79:16-81:6, 91:8-18, 104:1-105:10).  Defendant was also given

water by Detective Nash and was free to use the restroom.  (Tr. at 79:7-15, 104:13-15).

## II.    PROPOSED CONCLUSIONS OF LAW

In the instant case, Defendant raises two issues.[3]  First, Defendant alleges that the police

violated Defendant's Fourth Amendment rights under the United States Constitution by

searching his vehicle without a warrant after he was removed from his vehicle, placed under

arrest, and held in Detective Atkins' vehicle.  Defendant alleges that this Court should

recommend that all evidence seized as a result of that unconstitutional search should be

suppressed as fruit of the poisonous tree pursuant to *Wong Sun v. United States*, 371 U.S. 471,

484 (1963).  Second, Defendant alleges that, even if this Court were to recommend that the

search of the vehicle were constitutionally permissible, it should still recommend that the

statements subsequently provided by Defendant while under arrest violated his Fifth and

Fourteenth Amendment rights under the United States Constitution.  Specifically, Defendant

alleges that the United States must bear its burden of proving not only that he was read his

*Miranda* rights but that his confession was voluntary, intelligent, and knowing such that it

complied with the due process requirements of the United States Constitution.

### A.  *Fourth Amendment*

The Fourth Amendment guarantees that the "right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation,

and particularly describing the place to be searched, and the persons or things to be seized." U.S.

Const. amend. IV.  The Fourth Amendment applies to government intrusions into areas where

---

[3]    Defendant does not challenge the stop of the vehicle and concedes that MPD officers had
probable cause to stop him after observing him driving a car without having his seatbelt secured.

the person has a reasonable expectation of privacy. *Soldal v. Cook County, Illinois*, 506. U.S. 56, 69 (1992); *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978). In determining if a person has a reasonable expectation of privacy, courts consider whether a person claims an ownership or possessory interest in the property and whether he has established a right or taken precautions to exclude others from the property. *Rawlings v. Kentucky*, 448 U.S. 98 (1980); *Shealy v. Caldwell*, 16 Fed. App'x. 388, 400 (6th Cir. 2001). When the protections of the Fourth Amendment apply, a warrant is generally required to search a place or seize an item unless an exception to the warrant requirement applies. *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (citing *United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002)).

Here, Defendant asserts that Detective Atkins could not order Defendant to exit his vehicle solely based upon his nervousness. In *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), the United States Supreme Court addressed whether police officers on routine patrol who observed a defendant driving an automobile with an expired licensed tags and lawfully stopped him for the purpose of issuing him a traffic summons could order him to get out of his vehicle notwithstanding the fact that the officers had no reason to suspect foul play from the defendant at the time of the stop because there had been nothing unusual or suspicious about his behavior. The *Mimms* Court began by noting that the touchstone of the analysis under the Fourth Amendment is always "'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Id*. at 108-109 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). "Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law

officers.'" *Mimms*, 434 U.S.at 109 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).

In *Mimms*, the Government "freely concede[d] the officer had no reason to suspect foul play from the particular driver at the time of the stop, there having been nothing unusual or suspicious about his behavior." *Id*. at 109. Further, "[i]t was apparently [the officer's] practice to order all drivers out of their vehicles as a matter of course whenever they had been stopped for a traffic violation." *Id*. at 109-110. The Court stated that the safety of the officer is both "legitimate and weighty," and the Court also noted that it has "specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile." *Id*. at 111 (citing cases). Yet, against this important interest, the Court weighed the "intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car." *Id*. The Court found that the additional intrusion of being required to exit the car "can only be described as *de minimis*" because the "driver is being asked to expose to view very little more of his person than is already exposed," the "police have already lawfully decided that the driver shall be briefly detained," and, thus, "the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it." *Id*. Thus, the Court held that, "[w]hat is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." *Id*.

In the instant case, Officer Atkins was on routine patrol and initiated a traffic stop for the purpose of issuing a citation to Defendant for failure to wear his seat belt. More suspiciously than *Mimms*, Defendant acted demonstrably nervous during the traffic stop such that Detective Atkins felt the need to call for backup and insist that he step outside of his vehicle. This is

Detective Atkins' practice to require individuals to exit their vehicles when they display excessive nervousness.  Further, both Detective Atkins and Detective Nash testified to this behavior and found it to be abnormal for a routine traffic stop——including reluctant eye contact, shaking hands, and stuttered speech.  All of these steps are clearly consistent with the allowances for officer safety in *Mimms*.  Although Detective Atkins did not require him to exit his vehicle immediately here, he nonetheless was not done issuing the citation and had the authority to require Defendant to exit his vehicle while he completed the process of issuing the citation.

Defendant argues, however, that while an officer may instruct a suspect to exit the vehicle under *Mimms*, inquiries outside of the vehicle have limitations, and the stop may only be extended beyond the purpose of the traffic stop when it is based upon independent reasonable suspicion.  *See, e.g. United States v. Geraldo Bonilla*, No. 08-3461, 2009 WL 4906906, at **3 (6th Cir. Aug. 8, 2013) (citing *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008) (citations and internal quotations omitted) ("[O]nce the purpose of the traffic stop is completed, a police officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.").  The first step in the *Bonilla* court's analysis was to determine the scope of the traffic stop.

"In order to remain within the scope of the initial traffic stop, the officer's actions must reasonably relate to the purpose of the original stop."  *Bonilla*, 2009 WL 4906906, at **3 (citing *United States v. Bell*, 555 F.3d 535, 541 (6th Cir. 2009)); *see also United States v. Blair*, 524 F.3d 740, 752 (6th Cir. 2008); *Torres-Ramos*, 536 F.3d at 550.  Actions reasonable related to the original stop include requiring the driver to exit the vehicle as well as the time taken to request a

driver's license, registration, run a computer check, and issue a citation. *Bonilla*, 4906906, at **4 (citations omitted). Here, Detective Atkins was still in the process of issuing a citation. Although he had already used his department-issued PDA to search Defendant's social security number and talked to Defendant briefly from outside his car, he deemed it best for officer safety for him to complete the traffic stop and issue the citation with Defendant outside the vehicle due to his excessive nervousness. Thus, he sought backup, and Detective Nash arrived within a "matter of seconds." He then instructed Defendant to exit his vehicle, at which time Detective Atkins and Detective Nash both immediately saw the firearm in the floor of the driver's area near or on Defendant's foot. Defendant then exclaimed that the firearm was the reason for his nervousness, as he was a convicted felon. At this point, it is recommended that Detective Atkins and Detective Nash had probable cause to believe that Defendant had committed the crime of being a felon in possession of a firearm. Thus, it is recommended that Defendant's Fourth Amendment rights were not violated by his arrest or by the search of his vehicle being inventoried and that none of the evidence found subsequently constitutes fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

### B. Fifth Amendment

Next, Defendant argues that, even if this Court recommends that the search of his vehicle was constitutional, it should recommend that the statements later obtained from Defendant were elicited by unconstitutional means. The Fifth Amendment to the United States Constitution prohibits an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Under *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), an individual who is "taken into custody or otherwise deprived of his freedom by the authorities in

any significant way and is subjected to questioning" must be provided information on the following "[p]rocedural safeguards" to protect his privilege against self-incrimination:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

see also *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989).  A suspect may elect to waive his *Miranda* rights if the waiver is made voluntarily, knowingly, and intelligently.  *Miranda v. Arizona*, 384 U.S. at 444.  The inquiry into whether a proper waiver was made has "two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).  The government bears the burden of demonstrating both that the *Miranda* warnings were properly provided and that a suspect voluntarily, knowingly, and intelligently waived his rights. *Miranda,* 384 U.S. at 479.

The Due Process Clause of the Fourteenth Amendment provides that no person shall be deprived of life, liberty, or property, without due process of law. U.S. Const., amend. XVIV. With respect to confessions, the critical inquiry is under the Due Process Clause is whether the confession was voluntarily given.  Threshold to that determination is the requirement that the police did not extort the confession from the accused by means of coercive activity.  *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988).  Such coercive police activity is a necessary predicate

11

to any finding that a confession is not voluntary for purposes of due process. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law. *Id.* at 164.

   If it is established that coercive police activity was causally related to a defendant's confession, two further findings must be made before a due process violation may be found. *McCall*, 863 F.2d at 459. First, it is necessary to examine defendant's state of mind to determine whether the coercion in question was sufficient to overbear the will of the accused." *Id.* Second, defendant must prove that his will was in fact overborne because of the coercive police activity. *Id.* If police misconduct was not the crucial motivating factor behind a defendant's decision to confess, the confession may not be suppressed. *Id.* (quoting *Connelly*, 479 U.S. at 163).

   In the instant case, Defendant gave three statements to law enforcement while in custody at the CAT office. First, Defendant gave a statement containing his personal background information. Although there is no documentation confirming that he was informed of his *Miranda* rights, as was the case the other two instances where Defendant was so advised, Detective Nash testified that he was read his *Miranda* rights before he was asked to provide this information. The Court finds no basis to discredit Detective Nash's testimony and recollection of this fact. Further, during this portion of the questioning, Defendant was not asked particular facts regarding the criminal activity; therefore, while the Court recommends that Detective Nash's account be accredited, the Court further notes that the first portion does not contain the information pertaining to the criminal offenses charged in the instant matter.

Next, Defendant was read his *Miranda* rights for the second time as was documented on his statement and initialed by Defendant before he was questioned about purchasing and selling illegal drugs.  Detective Nash also testified that Defendant received this second notification of his *Miranda* rights and declined to exercise them.  Then, Defendant gave a statement regarding his purchasing and selling of narcotics and heroin.

Finally, Defendant executed a Rights Waiver Form before the third period of questioning, which explicitly stated as follows: "At this time, I am ready to answer questions without a lawyer present."  Detective Nash was one of the two witnesses who signed this document, and Detective Nash also testified that Defendant was advised of his rights this third time.  After this, he gave a statement regarding the firearm.  Based upon the foregoing, the Court recommends that the Government has met its burden that *Miranda* warnings were given before each of the three stages of questioning.

Further, the totality of the circumstances demonstrate that, rather than being coerced into making a confession, Defendant sought to provide a confession to lessen the charges against him and/or any potential punishment he may face.  The record reflects that he remained calm throughout the interview, that he was provided water during the questioning, that he was offered use of the restroom, and that showed no signs of intoxication in Detective Putman or Detective Nash's experience.  In fact, the record shows no signs of coercion or that his statement was involuntarily, unknowingly, or unintelligently made.  Accordingly, the Court recommends that Defendant's statement comports with the Fifth Amendment's protections outlined in *Miranda v. Arizona* and with the Fourteenth Amendment's due process protections.

**III.    CONCLUSION**

For the reasons set forth herein, it is recommended that Defendant's Motion to Suppress

be DENIED.


**IT IS SO ORDERED** this 10th day of January, 2018.

s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE


**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN
FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT.
28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE SAID OBJECTIONS OR EXCEPTIONS
WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS,
EXCEPTIONS, AND ANY FURTHER APPEAL.**